IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

JERRY LEE JACKSON,
      Plaintiff,

vs.                            Case No. 5:06cv88/MCR/EMT

MICHAEL J. ASTRUE,[1]
Commissioner of the
Social Security Administration,
      Defendant.
_____/

### ORDER, REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act (Act) and related statutes, 42 U.S.C. § 401, *et seq.* It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying Plaintiff's application for a period of disability and disability insurance benefits (DIB) under Title II of the Act.

      Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

---

[1]Michael J. Astrue succeeded Jo Anne B. Barnhart, and is presently the Commissioner of Social Security. Therefore, he is automatically substituted as Defendant. *See* Fed. R. Civ. P. 25(d)(1).

I.      PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB on November 18, 2002, alleging an onset of disability on April 7, 2002 (Tr. 52–54).[2]  Plaintiff's claim was denied initially and on reconsideration (Tr. 25, 26).  A request for a hearing by an administrative law judge (ALJ) was submitted in January 2004, and a hearing was held on May 5, 2005 (Tr. 38, 371–410).   On December 14, 2005, the ALJ rendered a decision in which he found that Plaintiff was not under a "disability" as defined in the Act at any time through the date of the decision (Tr. 14–24).  On March 24, 2006, the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 6–9).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998).   This appeal followed.

II.     FINDINGS OF THE ALJ

On December 14, 2005, the ALJ made several findings relative to the issues raised in this appeal (Tr. 14–24):

1)      Plaintiff meets the nondisability requirements for a period of DIB set forth in Section 216(i) of the Act and is insured for benefits through the date of the ALJ's decision.[3]

2)      Plaintiff has not engaged in substantial gainful activity since the alleged onset of disability.

3)      Plaintiff's history of obstructive sleep apnea (OSA), history of mild asthma, history of mild cognitive disorder, history of right L5 nerve root decompression, recurrent herniated nucleus pulposus, and dysthymic disorder are considered "severe" based on the requirements of 20 C.F.R. § 404.1520(c).

4)      These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5)      Plaintiff's allegations regarding his limitations are not totally credible.

---

[2] All references to "Tr." refer to the Transcript of Social Security Administration Record filed on June 20, 2006 (Doc. 8).

[3]Thus, the time frame relevant to this appeal is April 7, 2002 (alleged onset) to December 14, 2005 (date last insured).

6)   Plaintiff has the following residual functional capacity (RFC): he can sit four hours in an eight-hour day; and stand or walk four hours in an eight-hour day, alternating his position between sitting and standing and walking at least every 30–60 minutes; he can occasionally lift ten pounds, more frequently lift five pounds, and occasionally bend, stoop, crouch, kneel and climb; he should work in a temperature-controlled work setting, have no exposure to concentrated atmospheric pollutants (dust, smoke fumes), and perform no work at unprotected heights or with moving machinery; he needs the use of a hand-held cane while standing and walking; and he can perform simple one to two-step job tasks with no work requirement that he meet production quotas.

7)   Plaintiff is unable to perform any of his past relevant work (20 C.F.R. § 404.1565).

8)   He is a "younger individual between the ages of 18 and 44" (20 C.F.R. § 404.1563).

9)   Plaintiff has more than a "high school education" (20 C.F.R. § 404.1564).

10)   Transferability of skills is not an issue in this case (20 C.F.R. § 404.1568).

11)   Plaintiff has the RFC to perform a significant range of light and sedentary work (20 C.F.R. § 404.1567).

12)   Although Plaintiff's exertional limitations do not allow him to perform the full range of light or sedentary work, using Medical-Vocational Rules 202.21 and 201.28 as a framework for decision-making, there are a significant number of jobs in the national economy that Plaintiff could perform, including dispatcher, parking lot attendant and cashier II.

13)   Plaintiff was not under a "disability," as defined in the Act, at any time through the date of the ALJ's decision (20 C.F.R. § 404.1520(f)).

## III.   STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.   Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with

or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance, it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve

months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

     4.     If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

     5.     Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## IV.  PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

### A.  Personal History

Plaintiff was born on January 11, 1969 and was thirty-six years old at the time of his hearing before the ALJ (Tr. 374). He completed high school and received training in the military in computer programming and welding (Tr. 374–75). Plaintiff was in the army from 1988 through 2002, at which time he was honorably discharged, which Plaintiff has also described as "medically discharged," due to his OSA, asthma, and inability to mentally perform more than one task (Tr. 78, 375, 378). Plaintiff noted that he suffered a back injury in the military during a paratrooping exercise (Tr. 381). Plaintiff further noted, however, that his injury went undetected for approximately ten years (Tr. 382). The back injury was discovered when Plaintiff was still in the military, and he underwent a diskectomy at that time (id.). Plaintiff stated that his weight increased from approximately 205 pounds to 270 pounds following the surgery because he could not exert himself "right after" the surgery (Tr. 380). He has not worked since he was discharged from the military (Tr. 377).

When Plaintiff applied for benefits in November 2002, he indicated he could not sit or stand for long periods or bend over to pick up things (Tr. 96).  He stated he could walk for a half a mile or climb ten to fifteen steps before having to stop due to back pain and shortness of breath (*id.*).  He stated he could lift and carry ten pounds (*id.*).  When asked to describe his pain, Plaintiff noted that he experiences pain every morning, but when "the pain pills kick in" he experiences just a "little pain" the rest of the day (Tr. 98).  He noted that his pain medication was effective, and the only side effect was a decreased sex drive (Tr. 99).  Additionally, when Plaintiff completed a form and was asked to describe how his pain interfered with his daily activities, he noted nothing next to the following categories: personal care, laundry, child care, home maintenance, "other," and cooking/meal preparation[4] (Tr. 99–100).  Regarding vacuuming, Plaintiff indicated he cannot vacuum the "whole house without stopping"; as to shopping, Plaintiff indicated he cannot walk around the store for a long time without having to sit, although elsewhere he indicated his wife does the shopping; he noted he could not drive long distances or in the morning; finally, he noted that his ability to do yard work or gardening was limited "due to the grass," and he cannot play with his son the way he "want[s] to" (Tr. 99–101).

In May 2003, Plaintiff noted he does not shop because too much walking hurts his back, he has trouble dressing due to a chip in his left elbow, he drives a little, he is forgetful and has trouble focusing, and his physical condition has made him depressed (Tr. 121–22).

In August 2003, Plaintiff indicated that he has pain "every day all day" and that pain medications do not stop his pain, they only cause it to "go[] down" (Tr. 123–24).  He again described pain in his elbows and low back and indicated that he cannot pick up things or stand for very long (Tr. 125).  In September 2003, Plaintiff indicated that he wakes up sometimes at night and is "virtually paralyzed" because of the arthritis in his body (*see* Tr. 131).

At Plaintiff's hearing in May 2005, Plaintiff testified that he is in pain due to his back injury, and approximately one year before his hearing, a physician told him he would need another back

---

[4]Although Plaintiff indicated elsewhere that he does not cook, he suggested that he does not cook because he forgets what he is doing in the midst of cooking, not that he is physically unable to cook (*see, e.g.*, Tr. 101, 121, 124, 126).  However, in an apparent contradiction, Plaintiff also noted that he can concentrate on what he was doing "if it is one thing at a time" and that when he starts a simple job, he has no trouble finishing the job (Tr. 104).

surgery (a fusion) (Tr. 383, 385).  Plaintiff indicated that he has "always" used a cane, but it was now recommended that he also use a back brace (Tr. 384).  Plaintiff claimed that if he walks for an hour, his buttocks become numb and his toes tingle (Tr. 381, 385).  It was Plaintiff's understanding that a second back surgery may alleviate many of his problems (*see* Tr. 395).  Additionally, Plaintiff testified that he was born with only one kidney, and that kidney is ectopic, which limits the types of medication he can take (Tr. 386).  Plaintiff also noted that he uses an inhaler daily for his asthma and takes steroids, which affect his weight (Tr. 380, 393).

Plaintiff was asked to describe his physical abilities.  Plaintiff indicated that he can lift, but he "tr[ies] to stay [] at ten pounds," which is what his doctor has recommended (Tr. 388).  He noted that he lives with his wife, ten year-old daughter, and fifteen year-old son (Tr. 389–90).  He stated that everyone "pretty much" helps each other with household chores (Tr. 390).  His son does most of the heavy lifting, but Plaintiff does whatever he can do "that day" (*id.*).  For example, Plaintiff can sweep, dust, or vacuum "a little," but on a bad day he does not really feel like doing anything (Tr. 390).  Plaintiff also noted he has a bowel disorder, which can cause him to "go" without warning (Tr. 393).  Plaintiff described being depressed and indicated he was being treated with medication (Tr. 386, 389, 391).  He is also forgetful (Tr. 379, 391–92).

B.     Relevant Medical History (Physical)

Plaintiff's sleep was evaluated on September 23, 1999 (Tr. 163).  He was diagnosed with OSA and prescribed a continuous positive airway pressure (CPAP) mask (*id.*).  Plaintiff also underwent pulmonary testing in September 1999 after complaining of shortness of breath on exertion and tightness in his chest (Tr. 191).  It appears that Plaintiff was diagnosed with asthma at that time, although his high resolution CT scan was normal (*see* Tr. 187, 192).

On January 2, 2000, a magnetic resonance imaging (MRI) of Plaintiff's lumbar spine was obtained after Plaintiff's complaints of low back pain with numbness radiating down to his right foot (Tr. 181).  The MRI revealed a large disc extrusion at L5-S1 resulting in severe central canal stenosis, as well as a somewhat narrow canal (*id.*).

On April 24, 2000, Plaintiff underwent a right L-5 nerve root decompression and L4-5 diskectomy to relieve pain in his right leg (Tr. 146, 157–58).  Surgical intervention was required

because nonoperative treatment measures, including physical therapy, anti-inflammatory medication, and epidural steroid injections, had failed to provide relief (Tr. 259).

In September 2000, Plaintiff complained of pain in his left ribs when he moved or took a deep breath (Tr. 178). X-rays were taken, which revealed no acute rib fracture or focal lesion (*id.*).

Plaintiff underwent a chest CT scan on May 15, 2001, and no radiographic abnormalities were found (Tr. 177). Chest x-rays were then taken in July and September 2001 after Plaintiff's complaints of chest pain (Tr. 168, 176). Findings were negative or insignificant on each occasion (*id.*). In August 2001, Plaintiff underwent a left and right heart catheterization (Tr. 169). No evidence of limiting cardiac or pulmonary pathophysiology was found, and the results of Plaintiff's exercise testing were consistent with marked deconditioning (*id.*). It was recommended that Plaintiff participate in a regular exercise program (Tr. 170).

On May 16, 2001, Plaintiff's back condition was evaluated by Orthopaedist John L. Andreshak, a military physician (Tr. 257). Plaintiff complained of pain with physical activity (*id.*). He was noted to be status post L4-5 diskectomy with right L5 nerve root decompression (from April 24, 2000), and his previous x-rays were reviewed (*id.*). Dr. Andreshak opined that Plaintiff should be limited to a "desk-type" job and avoid lifting more than ten pounds, twisting, bending, and sitting or standing for more than forty-five (45) minutes at a time (Tr. 258). Additionally, it was recommended that Plaintiff participate in aerobic exercise such as swimming, walking, biking, or pool exercises (*id.*). Finally, Dr. Andreshak noted that Plaintiff's leg pain and numbness were largely resolved after his surgery and were absent as long as he avoided significant labor type activities (Tr. 257–58).

On or about May 22, 2001, Plaintiff was diagnosed with inflammatory bowel disease, but it was noted to be stable and well controlled on medication (Tr. 197). In June 2001, Plaintiff was evaluated after complaining of morning stiffness and pain in his back, left elbow, right shoulder, and left knee (Tr. 251). Plaintiff was assessed with tendonitis and bursitis, and he received a soft tissue injection near his left elbow (Tr. 252–53). No further diagnostic studies were recommended (Tr. 253).

The evidence also indicates that Plaintiff has a history of proteinuria, hypertension, and fused kidneys (Tr. 167, 207, 248). An October 12, 2001 renal/bladder ultrasound showed findings

consistent with cross fused ectopia of the right kidney without evidence of hydronephrosis, mass, or increased echogenicity of the renal cortex (Tr. 167).  The record does not indicate loss of renal function (Tr. 207).  Plaintiff was advised to lose weight and do aerobic exercise (*id.*).

Dr. William Frey performed an extensive pulmonary evaluation of Plaintiff in January 2002 (Tr. 191–95).  Dr. Frey reviewed Plaintiff's earlier pulmonary tests and referenced two normal high resonance CT scans performed in September 1999 and May 2001 (Tr. 192–93).  Dr. Frey also reviewed cardiopulmonary exercise testing performed in July 2001 and August 2001, noting that the July test, which was noninvasive, revealed an accelerated heart rate and decreased oxygen consumption, and the August test, which was invasive, suggested marked deconditioning (Tr. 193–94).  Dr. Frey assessed Plaintiff's asthma as "mild," and he noted that Plaintiff's OSA was well controlled by Plaintiff's use of a CPAP mask (Tr. 194).  Dr. Frey stated that the main finding from the cardiopulmonary exercise testing was that Plaintiff was deconditioned, and this also was the main etiology of Plaintiff's shortness of breath (*id.*).  It was recommended that Plaintiff begin an exercise program (*id.*).

Plaintiff underwent a general medical examination on July 10, 2002 (Tr. 295).  Gordon Kellogg, M.D., diagnosed Plaintiff as follows:  history of asthma, treated, with normal findings on physical examination; degenerative disk disease with a diskectomy, with minimal scar and good musculoskeletal function, postoperative; inflammatory bowel disease "with nothing substantiating the disease found on records and [Plaintiff ] certainly is not impressed with that at this time"; hypertension, treated, possibly with need for more treatment; anxiety secondary to unemployment; and left elbow spur (Tr. 297–98).  Dr. Kellogg also noted that no abnormalities were apparent in Plaintiff's left knee, and his kidney function was being reevaluated (Tr. 298).

Kris Lewandowski, M.D., a consulting physician, examined Plaintiff on April 15, 2003 (Tr. 261).  Although Plaintiff complained of back pain, Dr. Lewandowski concluded that Plaintiff walked and sat without problems, his back was non-tender to palpation, his extremity muscles were non-tender and of normal size and strength, deep tendon reflexes were normal, straight leg raising was negative, all joints had full range of motion, and sensation to touch and pain were normal (Tr. 261–62).  Dr. Lewandowski found that Plaintiff had no significant functional impairment, and he

was unable to detect any significant abnormalities on physical examination, no musculoskeletal impairment, and no signs of respiratory disease (Tr. 262).

Plaintiff was then evaluated by Cory Gaiser, D.O., on September 3, 2003 for complaints of persistent back pain and bilateral lower extremity pain (Tr. 339). Plaintiff stated that his back pain had persisted, even after his diskectomy, and it is accompanied by numbness in his lower extremities, but the pain is worse than the numbness (*id.*). Plaintiff reported that his back pain increases with ambulation; however, he noted that overall his symptoms improve with rest and medication (*id.*). A physical examination revealed some mild bilateral paraspinal tenderness with palpation down the right lower extremity; decreased forward flexion to about ten degrees; full extension, side-bending, and rotation; normal, non-antalgic gait; and effective heel-to-toe walk (*id.*). Dr. Gaiser noted that Plaintiff was "limited in his ambulatory ability," but there is no indication that Plaintiff required a cane or other assistive device (*id.*). Examination of Plaintiff's lower extremities revealed gross atrophy, "deep tendon reflexes 1/4 and equal patellar and Achilles, . . . decreased strength, EHL, tib anterior on the right [which] are 4/5 compared with the left," intact knee extensors and hip flexors, negative straight leg raise in the seated position, and intact sensation in all dermatomes tested, however, "subjectively altered over the right lower extremity in the lateral calf" (Tr. 339–40). Dr. Gaiser also reviewed Plaintiff's x-rays, which showed no fractures, dislocations, or listhesis, and well-maintained disc spaces (Tr. 340). The x-rays further revealed that, "Overall alignment is well maintained. No significant degenerative changes are noted. No clear laminotomy is appreciated." (*id.*). In conclusion, Dr. Gaiser assessed Plaintiff with bilateral lower extremity radiculpathy and low back pain, "status post lami/disk," and he referred Plaintiff for an MRI of the lumbar spine (*id.*).

Plaintiff was seen in follow-up by Dr. Gaiser on October 8, 2003, after obtaining the recommended MRI (Tr. 341). Dr. Gaiser reviewed the MRI, which showed a recurrent herniated nucleus pulposus at the L4-5 level to the right, "causing significant spinal canal stenosis narrowing down to 4 mm in the AP diameter" (*id.*). He also noted some congenital stenosis measuring only 8 mm, as well as a black disc at the L4-5 level (*id.*). The remaining lumbar levels appeared normal, and Plaintiff's gait was again noted to be normal and non-antalgic, but this time Plaintiff ambulated with a cane (*id.*). Dr. Gaiser recommended a revision of Plaintiff's earlier disk surgery, but a

decision was made to hold off on the surgery until Plaintiff's pain was more disabling (*id.*).  Plaintiff was prescribed a lumbar corset on October 10, 2003 (Tr. 342).

Plaintiff was first diagnosed with bronchial asthma in September 2001, and he later saw Angel Nunez, M.D., in September 2003 for this condition (Tr. 343, 345).  Plaintiff indicated that his asthma symptoms include coughing, wheezing, shortness of breath, and nightly sleep apnea (Tr. 343).  Plaintiff noted that he uses an inhaler daily, and his respiratory symptoms worsen when he tries to exercise (*id.*).  Plaintiff was advised to lose weight and continue his current medication regimen, including the use of his CPAP mask (Tr. 346).

Plaintiff presented to the Bay Medical Center Emergency Room on or about March 24, 2004 "doubled over" with abdominal pain (Tr. 365–66).  The next day Plaintiff felt much better and was diagnosed with acid reflux and prescribed Prevacid and dicyclomine (Tr. 364).

Plaintiff's primary care physician assessed lumbago (pain in the mid and lower back) and joint pain on June 4, 2004 and prescribed Tylenol and Lortab as needed for pain (Tr. 361).  Plaintiff was released without limitations and advised to diet, exercise, and lose weight (*id.*).

C.      Relevant Medical History (Mental)[5]

Plaintiff underwent a neuropsychological evaluation in March 2000 which revealed mild memory deficits, learning disorders in the areas of reading and spelling, a low average full-scale IQ score, and attention deficits (weakest in immediate recall) (*see* Tr. 141–45).  Plaintiff underwent a repeat evaluation in October 2001 (Tr. 202–06).  The repeat evaluation again indicated a mild memory deficit, consistent with Plaintiff's report, and evidence of learning disorders in the areas of reading and spelling (Tr. 202).  In pertinent part, Plaintiff was diagnosed with a mild cognitive disorder and depressive disorder, not otherwise specified (NOS) (it was also noted that Plaintiff's symptoms of depression were consistent with situational depression) (Tr. 202, 206).

Plaintiff was referred to Ramon Rubio, COL., M.C., on September 25, 2001 because he was presenting with some generalized anxiety and depression due to medical problems and his pending separation from military service (Tr. 198–99).  Plaintiff noted that his anxiety was mostly due to

---

[5]Although Plaintiff has not alleged that the ALJ erred in his consideration of Plaintiff's mental impairments, the records are summarized nonetheless, as they support the ALJ's ultimate conclusion that Plaintiff was capable of performing work.

family-related stressors (Tr. 198).  Although Dr. Rubio's records are incomplete (*see* Tr. 200), it appears that Dr. Rubio may have diagnosed Plaintiff with an adjustment disorder with a Global Assessment of Functioning (GAF) of 60[6] (Tr. 200).  However, no follow-up appointment was made, and it appears that Plaintiff was not prescribed any medications; rather, it was recommended that Plaintiff participate in a "healthy living skills group" (*see* Tr. 201).

Plaintiff was evaluated by military personnel for a service connected Department of Veteran's Affairs (VA) disability rating (Tr. 293–301).  Cynthia Javellana, M.D., examined Plaintiff on July 18, 2002 and diagnosed a dysthymic disorder with anxiety symptoms; mood disorder, secondary to multiple medical problems with chronic pain; and cognitive disorder, NOS, mild (Tr. 294–95).  She assessed Plaintiff with a GAF in the range of 55 to 60 (Tr. 295).  Dr. Javellana noted that Plaintiff suffered from chronic depression with anxiety symptoms and some cognitive impairment, with moderate to significant impairment in the area of industrial functioning due to his problems with depression and other medical problems (*id.*).  She recommended that Plaintiff become actively involved in psychological and psychiatric therapy, which Plaintiff agreed to do (*id.*).

David Loiry, Ph.D., a consulting psychologist, examined Plaintiff on April 18, 2003 (Tr. 264).  Plaintiff complained of multiple physical and mental problems (*id.*).  Plaintiff was diagnosed with a mood disorder secondary to a general medical condition and a cognitive disorder, NOS (Tr. 265).  Dr. Loiry noted that Plaintiff's problems appeared to be gradually worsening (*id.*).

Plaintiff sought mental health treatment from John B. Sapoznikoff, M.D. in September 2003 (Tr. 349).  Dr. Sapoznikoff diagnosed Plaintiff with "300.4" (dysthymic disorder (*see* Tr. 354)) with a GAF of 50[7] (Tr. 350).  Plaintiff was prescribed Prozac and Trazodone (*id.*).

---

[6]Global assessment of functioning is the overall level at which an individual functions including social, occupational, academic, and other areas of personal performance.  American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 30–32 (4th ed. 1994).  It may be expressed as a numerical score.  *Id.* at 32.  A score between 51 and 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning  (e.g., few friends, conflicts with peers or co-workers).  *Id.*

[7]A GAF score between 41 and 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 30–32 (4th ed. 1994).

Plaintiff met with Damon LaBarbera, Ph.D., on November 9, 2003 for a disability evaluation (Tr. 311).  Although Dr. LaBarbera noted that Plaintiff's pain and depression were likely genuine, he also noted that Plaintiff calls attention to his health proneness and some "symptom exaggeration" and "proneness to secondary gain may be apparent" (*id.*).  Dr. LaBarbera further noted that overall data suggests "some excessive display of symptoms" (*id.*).

D.      Other Information Within Plaintiff's Claim File

Plaintiff's file contains a rating decision from the VA, issued in response to Plaintiff's VA disability claim, dated September 26, 2002 (Tr. 57–67).  Plaintiff's service-connected disabilities were determined to be dysthymic disorder with cognitive disorder (50% disability rating—based on moderate symptoms), asthma (10% —symptoms are under control), OSA (50%—due to the use of a CPAP mask), hypertension (10%—based on Plaintiff's blood pressure (b/p); a higher disability rating is warranted for higher b/p levels), irritable bowel syndrome (0%—based on only occasional episodes), left elbow bursitis (10%), and low back degenerative disc disease, status post diskectomy (20%—based on moderate or slight limitation of the lumbar spine and no recent incapacitating episodes) (Tr. 57–62; *see also* Tr. 354–55).  No evidence of a left knee, chronic right shoulder, or proteinuria disability was found (Tr. 58, 62).  Finally, Plaintiff's ectopic right kidney, fused to the lower pole of the left kidney, was considered a congenital defect, unrelated to military service (Tr. 58, 62–63).

Edward W. Holifield, MD, a Board Certified Cardiologist, completed a Physical RFC Assessment on May 15, 2003 (Tr. 266–73).  He opined that Plaintiff was able to frequently lift and/or carry ten pounds; occasionally lift and/or carry up to twenty pounds; and he could stand, walk, and/or sit for six hours in an eight-hour workday (Tr. 267).  His ability to push/pull was unlimited (*id.*).  No postural, manipulative, visual, communicative, or environmental limitations were established (Tr. 269–70).  A second consulting physician completed a Physical RFC Assessment on December 12, 2003, and reached the same conclusions as Dr. Holifield, except in the area of environmental limitations (Tr. 313–20).  The second physician opined that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation (noting Plaintiff's asthma), as well as hazards such as machinery or heights (noting Plaintiff's back pain) (Tr. 317).      Clinical Psychologist Jane F Cormier, Ph.D., completed a Mental RFC Assessment

on July 2, 2003 (Tr. 275–78).  Dr. Cormier was asked to evaluate Plaintiff's mental abilities in the following areas:  understanding and memory, sustained concentration and persistence, social interaction, and adaptation (Tr. 275–76).  In each category, Dr. Cormier was given the following choices: not significantly limited, moderately limited, markedly limited, no evidence of limitation in the category, or not ratable on available evidence (*id.*).  Dr. Cormier found no marked limitations in any area, noting that Plaintiff complained of ongoing cognitive impairments, but none were substantiated by objective data, and any that may exist would be mild (Tr. 275–77).  She further concluded that Plaintiff was capable of social functioning, as well as routine, repetitive, task performance on a sustained basis (Tr. 277).  Dr. Cormier also completed a Psychiatric Review Technique form (PRTF) on July 2, 2003 (Tr. 279–92).  She evaluated Plaintiff's psychiatric condition under Section (or "Listing") 12.02 of 20 C.F.R. Part 404, Subpart P, Appendix 1 (Organic Mental Disorders) and Section 12.04 (Affective Disorders) (Tr. 279).  Dr. Cormier found that Plaintiff suffered from medically determinable impairments; namely, a cognitive disorder, NOS, and a mood disorder secondary to physical condition, but she concluded that neither disorder satisfied the diagnostic criteria of the Listings (Tr. 280, 282 ).  Dr. Cormier opined that Plaintiff's impairments caused mild restrictions of activities of daily living and mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no extended episodes of decompensation (Tr. 289).  Interestingly, Dr. Cormier noted that Plaintiff appears "to have good recall of what he <u>can't</u> remember" (Tr. 291) (emphasis in original).  She also noted that there was no evidence of current mental health treatment and, although an evaluation of Plaintiff had indicated some depression, his cognitive functioning was intact  (*id.*).

Clinical Psychologist Eric D. Martin, Ph.D., completed a Mental RFC Assessment and PRTF on December 12, 2003 (Tr. 321–38).  Like Dr. Cormier, Dr. Martin was asked to evaluate Plaintiff's mental abilities in four areas (Tr. 321–22).  Dr. Martin found no marked limitations in any area, noting Plaintiff's stability and ability to engage in "the normal daily activities that are required in the simple demands of unskilled work" (Tr. 323).  Dr. Martin further noted that Plaintiff's "Cognitive and social functioning appear generally intact although concentration may be impaired at times.  Adaptation appears adequate." (*id.*).  On the PRTF, Plaintiff's mental impairments were evaluated under Listings 12.02 and 12.04 (Tr. 325).  Although Plaintiff was noted to have medically

determinable impairments (i.e., cognitive disorder, NOS, and depressive disorder, NOS), Dr. Martin opined that neither impairment satisfied the diagnostic criteria of the Listings, and Plaintiff had no more than a moderate degree of functional limitation (Tr. 326, 328, 335).  Dr. Martin summarized the results of Dr. LaBarbera's examination, noting his findings concerning Plaintiff's scores on the Wechsler Memory Scale, and concluding that "[Plaintiff] is able to engage in some of his ordinary daily activities and he does have some limitations but not to the extent that they should prevent him from performing in some routine type [substantial gainful employment].  He is independently functional." (Tr. 337).

A vocational expert (VE) testified at Plaintiff's hearing before the ALJ, but her testimony is not fully audible (*see, e.g.*, Tr. 401–07).  The record reflects, however, that she characterized Plaintiff's past work within the military, classifying his prior positions as light work, ranging from skilled to semi-skilled, with Specific Vocational Preparation (SVP) levels from four to seven (Tr. 405).[8]  The VE appears to have indicated that Plaintiff could not return to this type of work, but he could perform unskilled, sedentary jobs including surveillance systems monitor, parking lot attendant, and cashier, and that such jobs were available within Florida (the VE's answer regarding the availability of jobs nationally is inaudible) (Tr. 406, 408).[9]

V.      DISCUSSION

---

[8]The ALJ indicated in his decision that the VE characterized Plaintiff's past work positions as light to medium work, with SVP's ranging from three to seven (Tr. 21).  The court cannot reconcile this discrepancy due to the inaudible portions of the transcript.  However, the parties have not raised any issues relating to the characterization of Plaintiff's past work.

[9]The ALJ noted that the Medical-Vocational Guidelines dictate that Plaintiff is capable of performing a significant range of light and sedentary work (Tr. 21).  However, because Plaintiff was not able to perform a full range of work at each level, the ALJ relied on VE testimony.  Again, although the VE's testimony is not fully audible, the ALJ summarized her testimony in his decision as follows:

> The ALJ asked the [VE] whether jobs exist in the national economy for an individual of [Plaintiff's] age, education, past relevant work experience and [RFC] as determined.  The [VE] testified that assuming the hypothetical individual's specific work restrictions, he is capable of making a vocational adjustment to other work.

The ALJ then indicated that the VE testified Plaintiff could peform the jobs of dispatcher, parking lot attendant, and cashier II, and that significant numbers of these jobs exist in both the state and national economies (*see* Tr. 22).

Plaintiff raises two issues on appeal.  First, Plaintiff alleges that the ALJ failed to give proper weight to Plaintiff's testimony concerning his pain (Doc. 15 at 1).  Second, Plaintiff asserts that the ALJ failed to properly consider the opinions of Plaintiff's treating physician (*id*.).

A.       Plaintiff's testimony concerning his pain

Plaintiff asserts that the ALJ failed to properly evaluate his complaints of pain, specifically referring to the testimony Plaintiff provided during his hearing before the ALJ (Doc. 15 at 13–15).

As this court is well aware, pain is treated by the Regulations as a symptom of disability. Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms."  *Accord* 20 C.F.R. § 416.929.  In Hand v. Heckler, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following additional pain standard:

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

The Eleventh Circuit continues to follow the Hand test.  Wilson v. Barnhart, 284 F.3d 1219 (11th Cir. 2002); Kelley v. Apfel, 173 F.3d 814 (11th Cir. 1999); Elam v. Railroad Retirement Bd., 921 F.2d 1210, 1216 (11th Cir. 1991); Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991); Martin v. Railroad Retirement Bd., 935 F.2d 230, 233 (11th Cir. 1991).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard."  Wilson, *supra*, 284 F.3d at 1226.  Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the Hand standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself."  Elam, 921 F.2d at 1216.  The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence."  Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992) (citing Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987)).

However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered.  *Id.*; Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, "[i]f the Commissioner refuses to credit [subjective testimony of the plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true." MacGregor, 786 F.2d at 1054; Holt v. Sullivan, 921 F.2d at 1223.  "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court.  The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the district court or this Court] to conclude that [the ALJ] considered [plaintiff's] medical condition as a whole." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted).  The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532 (11th Cir. 1991).

Underlying the Hand standard is the need for a credibility determination concerning a plaintiff's complaints of pain.  Those complaints are, after all, subjective.  "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain." Scharlow v. Schweiker, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints").[10]  People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others.  "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain.  This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ." Hand, *supra,* at 1548-49.  It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence." Arnold v. Heckler, 732 F.2d 881, 884  (11th Cir. 1984).   Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that.  The evidence

---

[10]Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit.  Bonner v. Pritchard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

In the instant case, the ALJ concluded that Plaintiff's subjective complaints were not fully credible, and his symptoms were not as limiting as he alleged (Tr. 23). Initially, the court notes that in analyzing Plaintiff's complaints of pain, the ALJ specifically referenced 20 C.F.R. § 404.1529 (Tr. 19). The ALJ went on to find that the "medical records are not particularly persuasive" and do not support Plaintiff's assertion of disabling impairments (Tr. 19).

The ALJ noted that Plaintiff had "good musculoskeletal function" (*id.*). Although Plaintiff underwent back surgery prior to his alleged onset date (Tr. 155–58), the records from the relevant period do not support his allegation of a disabling back impairment. For example, an April 2003 examination of Plaintiff's back revealed a normal shape with no tenderness to palpation and no paraspinal muscle spasm (Tr. 261–62). Straight leg raising was negative, Plaintiff had full range of motion in all joints, and no musculoskeletal impairment was found (Tr. 262–63). Furthermore, Plaintiff's gait was repeatedly noted to be normal (Tr. 262, 264, 296–97, 339, 341). He had no neurological deficits, and his strength was 5/5 (Tr. 262, 304). X-rays of the lumbar spine dated September 2003 showed no fractures, dislocations, or listhesis; well-maintained disk spaces; well-maintained overall alignment; and no significant degenerative changes (Tr. 340). In September 2003, only mild paraspinal tenderness was noted bilaterally with decreased forward flexion (Tr. 339). Although a MRI scan revealed a recurrent herniated nucleus pulposus at L4-5 with right lower extremity radiculopathy, Plaintiff was hesitant to proceed with surgery and Dr. Gaiser noted in October 2003 that they would "hold off until the pain [was] more disabling" (Tr. 341). In addition, Dr. Lewandowski noted that Plaintiff was able to walk and sit without problems, could change positions without difficulty, could bend his back ninety degrees, could heel and toe walk, and could stand on one extremity with good balance bilaterally (Tr. 261–62). Dr. Gaiser also indicated that Plaintiff was able to heel and toe walk "effectively" (Tr. 339). Although Plaintiff complained of intermittent numbness in his buttocks and right leg (Tr. 261), Dr. Lewandowski noted that the joints in Plaintiff's lower extremities were non-swollen, non-tender, and not deformed (Tr. 262). His lower extremities were 100 percent mobile on passive and active movement bilaterally, and the muscles in his lower extremities were normal in size and strength bilaterally (*id.*). Plaintiff had no

tenderness, spasm, or swelling in any of his joints (Tr. 297).  His post-operative musculoskeletal function was noted to be good (*id.*).  Dr. Lewandowski detected no significant abnormalities on examination and concluded that Plaintiff had no musculoskeletal impairment and no signs of a respiratory disease (Tr. 262).

Moreover, on July 10, 2003, Plaintiff reported no complaints of radiculopathy (Tr. 295).  On August 13, 2003, Plaintiff reported no complaints (Tr. 304).  On that date, the treating physician noted that Plaintiff was a "healthy male," and he cleared Plaintiff for sports participation (*id.*). On June 4, 2004, Plaintiff once again reported that he was feeling fine and had no complaints (Tr. 360). While lack of medical evidence to support the degree of pain alleged cannot be the sole determinant of a claimant's believability, it is an important factor that may be considered.  *See* Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991).

In July 2002, Plaintiff noted that he experienced pain but was able to "override" it (Tr. 297). He was taking no pain medications at that time (Tr. 296).  In January 2003, Plaintiff was prescribed Tylenol and Naprosyn to take as needed, and he was given a handout on exercises (Tr. 274).  As noted by the ALJ, Plaintiff advised Dr. Gaiser that the Tylenol and Naprosyn provided some relief of his pain symptoms, and further, that his "symptoms improved with rest and medications" (Tr. 19, 339).  On July 17, 2003, and again on August 13, 2003, Plaintiff reported that he was taking no medications (Tr. 304, 307).  In September 2003, Plaintiff noted that his symptoms were improved with rest and medications (Tr. 339).  "A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling."  Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (quoting Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987) (footnote omitted)). Plaintiff also stated in September 2003 that he wanted to go back to work (Tr. 339).  Plaintiff's desire to return to work is inconsistent with disability and indicates that he did not view his pain as disabling.  *See* Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995).

Plaintiff states that he walks with a cane to ease his pain (Doc. 15 at 13); however, the medical records contain no recommendation from any treating physician that Plaintiff use a cane to

ambulate.  *See* Raney v. Barnhart, 396 F.3d 1007, 1010 (8th Cir. 2005) ("We also find no medical records or opinions documenting Raney's use of a cane as being medically necessary.").[11]

The ALJ further noted that Plaintiff's "clinical findings remain fairly benign at the most recent medical examination of June 4, 2004" (Tr. 19).  Indeed, a review of Plaintiff's records from a doctor's visit on June 4, 2004, reveal that Plaintiff was "released without limitations" (Tr. 361).

In further discounting Plaintiff's complaints of pain, the ALJ noted Plaintiff's sporadic medical treatment since his discharge from the Army, "despite his entitlement to Veterans Affairs Medical Center medical treatments" (Tr. 19).  The ALJ noted that the most recent medical records provided by Plaintiff at his hearing in May 2005 were more than a year old (*see* Tr. 353–70 (records submitted by Plaintiff covering treatment through June 2004), which actually reflect that the records were almost a year old).  The ALJ concluded that "if someone was in as much pain as [Plaintiff] alleges[,] there would be more evidence of consistent treatment, not just sporadic routine follow-up care with minimal clinical findings" (Tr. 19).  *See* Bentley, 52 F.3d at 786 (failure to seek medical treatment for a long time during a claimed period of disability tends to indicate tolerable pain).

The ALJ also noted that Plaintiff's "credibility is further eroded given his failure to follow prescribed treatment" (Tr. 19).  In pertinent part, the ALJ referenced the repeated recommendations that Plaintiff lose weight and participate in an exercise program (Tr. 19–20).

Regarding Plaintiff's asthma, the ALJ first noted that it was well controlled (Tr. 19).  Indeed, although Dr. Frey assessed Plaintiff with asthma in January 2002, the asthma was noted to be "mild" (Tr. 194).  Moreover, in July 2002, Plaintiff reported that although he was originally diagnosed with asthma, he was later diagnosed with sleep apnea and placed on a CPAP, and he did well with his follow-up CPAP treatments (Tr. 295).  In January 2003, Plaintiff's asthma was noted to be poorly controlled, as a few faint end expiratory wheezes were noted (Tr. 274).  However, it was also noted that Plaintiff's air movement was "fair," and Plaintiff was prescribed Singulair and Flovent (*id.*).

[11]Despite the lack of a medical recommendation that Plaintiff use a cane, the court notes that the ALJ accommodated Plaintiff's stated need for a cane in his RFC determination.  Specifically, the ALJ noted that Plaintiff "needs the use of a hand-held cane while standing and walking" (Tr. 23). In addition , regarding the ALJ's determination that Plaintiff had the RFC to perform a range of light work, the court notes that this opinion is supported by the findings of the DDS physicians and Dr. Lewandowski, a consultative examiner (*see* Tr. 261–63, 266–73, 313–20).

Dr. Lewandowski's April 2003 examination revealed bilateral breath sounds with no signs of a respiratory disease (Tr. 262). In May 2003, Plaintiff's asthma was noted to be "less than ideally controlled," and his Flovent was increased (Tr. 309). Thereafter, in July 2003, Dr. Kellogg noted that Plaintiff had been treated for a history of asthma, but Dr. Kellogg's findings were "normal on physical examination today" (July 23, 2003) (Tr. 297). Furthermore, examinations repeatedly revealed no evidence of wheezing (Tr. 305 (July 2003), 309 (May 2003), 360 (June 2004)). These findings are not consistent with a disabling impairment.

Finally, the ALJ questioned Plaintiff's credibility because of Plaintiff's attempt to "portray his situation [as] worse than it actually is" (Tr. 20). The ALJ noted Dr. LaBarbera's opinion that Plaintiff was exaggerating his symptoms and "some possible secondary gain" was apparent (*id.*).

The ALJ is entitled to consider inconsistencies between a claimant's testimony and the evidence of record. *See* McCray v. Massanari, 175 F. Supp.2d 1329, 1338 (M.D. Ala. 2001). While any one of the above inconsistencies alone might not be enough to find Plaintiff's subjective complaints not credible, certainly the totality of the inconsistencies provide, at the very least, substantial evidence supporting the ALJ's decision that Plaintiff was not credible. Because the ALJ articulated the inconsistencies on which he relied in discrediting Plaintiff's testimony regarding his subjective complaints, and because his credibility finding is supported by substantial evidence on the record as a whole, the ALJ's credibility finding should be affirmed. *See* Foote, 67 F.3d at 1562; MacGregor, 786 F.2d at 1054.

B.      The opinions of Plaintiff's treating physician

Plaintiff asserts that the ALJ failed to properly consider the opinion of Dr. Gaiser, a treating physician (Doc. 15 at 15–17). More specifically, Plaintiff states that the ALJ appears to have "completely overlook[ed] the medical records and the opinion of Dr. Gaiser" (*id.* at 16).

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See* Lewis v. Callahan, 125 F.3d 1436, 1439–41 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d). "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was

conclusory or inconsistent with the doctor's own medical records." Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. See Edwards, 937 F.2d 580 (finding that the ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986); see also Schnor v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion. See Wilson v. Heckler, 734 F.2d 513, 518 (11th Cir.1984); see also 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether Plaintiff meets a listed impairment, a claimant's RFC (see 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors, because those ultimate determinations are the providence of the Commissioner. 20 C.F.R. § 404.1527(e). The opinion by a treating physician that a patient is "unable to work" or is "disabled" is not dispositive for purposes of Social Security claims. The Commissioner's regulations and the interpretations of those regulations clearly provide that an ALJ should give weight to a physician's opinions concerning the nature and severity of a claimant's impairments, but that the ultimate question of whether there is disability or inability to work is reserved to the Commissioner. For instance, 20 C.F.R. § 404.1527(e)(1) specifically states that a finding of

disability or inability to work by a medical source does not mean that the Commissioner will automatically reach the same conclusion.  Furthermore, the Commissioner "will not give any special significance to the source" of an opinion on issues reserved for the Commissioner.  20 C.F.R. § 404.1527(e)(3); *see also* Social Security Ruling 96-5p (whether an individual is disabled is a question reserved to the Commissioner; treating source opinions on such questions are "never entitled to controlling weight or special significance").  Although such opinions on disability are not entitled to controlling weight, they must not be ignored, and the Commissioner must examine the entire record to determine whether such opinions are supported by the record.  SSR 96-5p.  In Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997), the court reversed the ALJ's finding of no disability, in part because the ALJ relied on a treating physician's report that the claimant could no longer work as a longshoreman when this report was ambiguous as to whether the claimant could do any work, and the physician subsequently wrote a letter saying the claimant was completely disabled.  To require the Commissioner to accept as controlling a statement that a patient is or is not disabled would require the Commissioner to credit the physician not only with knowledge of the patient's physical condition, but also with an understanding of the nuances of how the regulations analyze physical limitations with respect to job experience, age, education, transferability of skills, the definitions of the various levels of exertion relevant to types of work, and similar matters. Additionally, a physician's opinion on whether a person is able to work may be colored by such things as the physician's knowledge of local hiring practices, whether there are specific job vacancies, a person's reluctance to do a particular kind of work, and similar matters.  These things are not properly considered by the Commissioner in determining disability.  20 C.F.R. § 404.1566. For all these reasons, a physician's opinion that his or her patient cannot work or is disabled is not a conclusive medical opinion for the purpose of Social Security benefits determinations and by itself is not entitled to special significance.

The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.  *See* Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)).  "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." Oldham v. Schweiker, 660 F.2d 1078, 1084 (Former 5th Cir. Unit B Nov. 1981).

Here, contrary to Plaintiff's assertion, the ALJ discussed Dr. Gaiser's treatment records in his decision (*see* Tr. 16).   Moreover, there are no opinions from any of Plaintiff's treating physicians, including Dr. Gaiser, that Plaintiff is disabled.   Similarly, there are no opinions from Plaintiff's treating physicians that assess him with specific functional limitations.   Thus, it does not appear that the ALJ rejected any opinion of Dr. Gaiser.

Nevertheless, Plaintiff appears to allege that the ALJ rejected Dr. Gaiser's opinion that Plaintiff's "pain would become 'more disabling' without the surgery"(Doc. 15 at 17).   However, this is not what Dr. Gaiser stated.   Dr. Gaiser stated he would "hold off [on surgery] until the [Plaintiff's] pain was more disabling" (Tr. 341).   Plaintiff speculates that, because Dr. Gaiser made this statement in October 2003 (his last appointment with Plaintiff), "almost two years later, [Plaintiff's pain] would have become more disabling" (Doc. 15 at 17) (emphasis added).   However, the court cannot accept Plaintiff's speculation as fact.   The record simply reflects that Plaintiff's pain was not disabling enough to go forward with surgery in October 2003, and if Plaintiff's pain worsened, surgery would be reconsidered at that time.   Plaintiff did not see Dr. Gaiser again after October 2003.   Plaintiff did, however, see another physician in June 2004 and was assessed with lumbago (Tr. 361).   That physician prescribed pain medications, released Plaintiff without limitations, advised Plaintiff to exercise, and did not recommend surgery (*id.*).   Thus, the record does not support Plaintiff's assertion that his pain would necessarily be disabling prior to his date last insured.

For the foregoing reasons, this court concludes that the Commissioner's decision is supported by substantial evidence and should not be disturbed.   42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at1560.   Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Based upon the foregoing, it is **ORDERED**:

The clerk of court is directed to change the docket to reflect that Michael J. Astrue substituted for Jo Anne B. Barnhart as Defendant.

And it is respectfully **RECOMMENDED:**

That the decision of the Commissioner be **AFFIRMED,** that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 1<u>st</u> day of May 2007.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

      **Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**